```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - X
                                           :
In re:                                     :   Chapter 7
                                           :
        ANDREW A. HYMAN,                   :   Bankruptcy Court
                                           :   Case No.
                        Debtor.            :   03 B 22150 (ASH)
                                           :
- - - - - - - - - - - - - - - - - - - - - X
G. HALLETT DENTON, as Executor of the      :   ECF CASE
Estate of George W. Denton,                :
                                           :
                Plaintiff-Appellant,       :   05 Civ. 2867 (WCC)
                                           :
        - against -                        :
                                           :
ANDREW A. HYMAN,                           :   OPINION
                                           :   AND ORDER
                Defendant-Appellee.        :
- - - - - - - - - - - - - - - - - - - - - X
```

**A P P E A R A N C E S :**

                                                  GREENFIELD, STEIN & SENIOR, LLP
                                                  **Attorneys for Plaintiff-Appellant**
                                                  600 Third Avenue
                                                  New York, NY 10016

KENNETH L. STEIN, ESQ.
JEFFERY H. SHEETZ, ESQ.

       Of Counsel

                                                  M. STUART GOLDBERG, LLC
                                                  81 Main Street, Suite 205
                                                  White Plains, NY 10601

MARC S. GOLDBERG, ESQ.
                                                  - and -
       Of Counsel

                                                  MEYERS TERSIGNI FELDMAN & GRAY LLP
                                                  14 Wall Street, 19th Fl.
                                                  New York, NY 10005

ANTHONY L. TERSIGNI, ESQ.

       Of Counsel                                  **Attorneys for Defendant-Appellee**

**CONNER, Senior D.J.:**

Plaintiff-Appellant G. Hallett Denton ("Creditor"), executor of the estate of his deceased father, George W. Denton (the "Estate"), appeals the January 21, 2005 order of United States Bankruptcy Judge Adlai S. Hardin, Jr. denying Creditor's motion for summary judgment and granting the cross-motion of defendant-appellee Andrew Hyman ("Debtor") discharging Hyman's debt and dismissing Creditor's claims under Section 523(a) of the Bankruptcy Code based on collateral estoppel from the findings of the Westchester County Surrogate's Court. The issues presented on appeal under 11 U.S.C. § 523 are: (1) whether a judgment obtained in state court by a creditor against a debtor collaterally estops the debtor from relitigating certain issues in Bankruptcy Court; (2) what conduct constitutes defalcation for purposes of the Bankruptcy Code; and (3) whether equal shareholders in a close corporation are fiduciaries as that term is understood under the Bankruptcy Code. We affirm the decision of the Bankruptcy Court.

## BACKGROUND

In 1984, George W. Denton and Hyman began working for an insurance agency owned by Henry A. Deppe. (Hyman Aff. ¶ 3.) Deppe's insurance agency operated as a general agent of The Guardian Life Insurance Company of America ("Guardian") and marketed Guardian life insurance through a separate entity called National Pension Service, Inc. ("NPS"), which designed and administered pension plans funded by life insurance sales. (*Id.* ¶¶ 3-4.) By 1987, Deppe was nearing retirement and agreed to recommend that Guardian permit Denton and Hyman to replace him as

1

general agent.[1]  (*Id.* ¶ 5.)  Guardian subsequently named Denton and Hyman as successors to Deppe's general agency.  (*Id.* ¶ 6.)

The pair organized Denton-Hyman Agency, Inc. ("DHA") to act as general agent and became equal shareholders of the company, with Denton serving as President and Hyman as Vice President. (*Id.*; Stein Decl., Ex. A at 1-2.)  They also formed and took equal shares in both NPS and National Pension Actuaries, Inc. ("NPA") in order to continue Deppe's pension planning and administrative companies of the same names.[2]  (Hyman Aff. ¶ 6 & n.1; Stein Decl., Ex. A at 1-2.)  Accordingly, on or about January 1, 1988, Deppe executed agreements transferring the assets of each of his companies to their respective newly-formed counterparts, as well as an agreement not to compete, for a total price of $655,234, payable in installments and personally guaranteed by Denton and Hyman jointly and severally.  (Hyman Aff. ¶ 6.)  In addition, DHA and NPS incurred start-up financing debts of $1.6 million, also personally guaranteed by both Denton and Hyman jointly and severally.  (*Id.* ¶¶ 9-10.)

On February 14, 1989, Denton died unexpectedly, just over one year after he and Hyman assumed control of the enterprise.  (Stein Decl., Ex. A at 2.)  No shareholder or similar agreement existed governing buyout or enterprise division in the event one of the men died or left the business. (11/15/04 Hr'g Tr. at 10.)  The general agency granted by Guardian to DHA automatically terminated upon Denton's death. (Hyman Aff. ¶ 11 & Ex. 2; 10/28/04 Hr'g Tr. at 24.)  This

---

[1] Guardian insurance agencies cannot be sold; the appointment of a general agency resides solely in Guardian's discretion.  (Hyman Aff. ¶ 5.)

[2] By marketing life insurance through pension planning, Deppe's agency garnered substantial tax benefits under the then-existing tax laws and increased its life insurance sales beyond that capable through mere direct sales.  (Hyman Aff. ¶ 4; Pl.-Appellant Br. at 10.)

"precluded the Denton estate or [DHA] from becoming a shareholder in the new general agency." (Stein Decl., Ex. A at 7.)

Immediately after Denton's death, Debtor began negotiating with Guardian to assume sole control of the DHA general agency, and, in October 1989, Guardian granted the general agency to Debtor as sole proprietor of the newly-formed Andrew A. Hyman Agency, Inc. ("AHA"). (*Id.*, Ex. A at 2-3; Hyman Aff. ¶ 14.) Additionally, Hyman assumed control of NPS and maintained its operations, but with all life insurance proceeds on a going-forward basis being collected by AHA instead of DHA. (Hyman Aff. ¶ 16; Stein Decl., Ex. A at 2-3.) Hyman also began immediate discussions with Creditor regarding both the continuation of these businesses and the purchase of the Estate's half-interest in DHA. (Hyman Aff. ¶¶ 12-13, 16-17.) Both parties were aware that allowing the businesses to lapse would affect the amount of DHA/NPS debts for which the Estate would be responsible, as Hyman lacked sufficient funds to satisfy those debts and all debts were incurred jointly and severally. (*Id.* ¶ 10; 10/28/04 Hr'g Tr. at 23.) It appears that Creditor consented to Debtor's continuation of the business and actively engaged in buyout negotiations. (Stein Reply Decl., Ex. 7 at 175-76, 210.) Hyman continued running AHA until 1994, when AHA was replaced as Guardian's general agent; NPS and NPA operated with Hyman as director until April 2002, at which time their operations were outsourced. (Stein Decl., Ex. A at 3.) By this time, Hyman had paid off the entire $1.6 million debt owed by DHA and NPS, apparently through the use of monies still owed DHA in addition to funds earned by AHA. (Hyman Aff. ¶ 30.)

From 1989 to 1994, Creditor and Debtor engaged in lengthy, arms length negotiations in which both parties were advised by competent professionals concerning Hyman's purchase of the Estate's half-interest in the defunct DHA. (*Id.* ¶¶ 19-25 & Ex. 10; Stein Reply Decl., Ex. 7 at 176-

3

77, 181-82, 210.) When these negotiations failed to produce an agreement, Creditor filed a shareholder derivative claim against Debtor in Westchester County Surrogate's Court. (Hyman Aff. ¶ 20.) That court issued a post-trial decision dated December 21, 2002, and Decree dated April 23, 2003, requiring Hyman to pay roughly $2.7 million to DHA for profits collected by AHA after Denton's death. (Stein Decl., Exs. A & B.) The Appellate Division affirmed the Surrogate's Court's decision on April 12, 2004. (*Id.*, Ex. E ¶ 19.)

However, before the Surrogate's Court issued its Decree, Debtor filed for Chapter 11 protection in recognition of his inability to pay the anticipated judgment; the case was converted to Chapter 7. (Stein Decl., Ex. E ¶ 10.) Consequently, Creditor filed a claim in Debtor's bankruptcy case seeking an order fixing and allowing the Estate's claim in the amount of the Surrogate's Court's judgment and an order excepting the debt from discharge under 11 U.S.C. §§ 523(a)(2), (4) and (6). Creditor and Debtor each filed motions and cross-motions for summary judgment, which resulted in an oral decision by Bankruptcy Judge Hardin rejecting a number of Creditor's claims but establishing a schedule leading to a trial on the merits of Creditor's claim under Section 523(a)(4). Before trial, Creditor voluntarily dismissed with prejudice the nondischargeability claim under 523(a) in order to forego a trial and immediately proceed with an appeal regarding the issue of collateral estoppel based upon the Surrogate's Court's decision. Judge Hardin accordingly issued an appealable, final decision and order on January 21, 2005, which this Court now addresses. This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 158.

4

# DISCUSSION

## I. Standard of Review

On appeal, a bankruptcy court's legal conclusions are reviewed *de novo*. *See In re Dawnwood Props./78*, 209 F.3d 114, 116 (2d Cir. 2000). However, the bankruptcy court's findings of fact cannot be set aside unless they are clearly erroneous. *See* FED. R. BANKR. 8013; *In re Dawnwood*, 209 F.3d at 116; *see also Gulf States Exploration Co. v. Manville Forest Prods. Corp. (In re Manville Forest Prods. Corp.)*, 896 F.2d 1384, 1388 (2d Cir. 1990).

On a claim of nondischargeability under § 523(a)(4), the Supreme Court has held that the burden is on the party claiming nondischargeability, and the appropriate level of proof is a preponderance of the evidence. *See Grogan v. Garner*, 498 U.S. 279, 285 (1991); *In re Hambley*, 329 B.R. 382, 396 (Bankr. E.D.N.Y. 2005). Exceptions to dischargeability should be literally and strictly construed against the creditor and liberally in favor of the debtor. *See, e.g., Gleason v. Thaw*, 236 U.S. 558, 562 (1915) ("In view of the well-known purposes of the bankrupt law, exceptions to the operation of a discharge thereunder should be confined to those plainly expressed . . . ."); *Household Fin. Corp. v. Danns (In re Danns)*, 558 F.2d 114, 116 (2d Cir. 1977); *Cmty. Mut. Sav. Bank v. Landrin (In re Landrin)*, 173 B.R. 307, 310 (S.D.N.Y. 1994). This comports with the "fresh start" policy underlying the Bankruptcy Code. *See, e.g., Wetmore v. Markoe*, 196 U.S. 68, 77 (1904) ("Systems of bankruptcy are designed to relieve the honest debtor from the weight of indebtedness which has become oppressive, and to permit him to have a fresh start in business or commercial life, freed from the obligation and responsibilities which may have resulted from business misfortunes."); *Rupert v. Krautheimer (In re Krautheimer)*, 210 B.R. 37, 46 (Bankr. S.D.N.Y. 1997) ("The concept of the discharge is, without question, the 'holy grail' of the Bankruptcy Code."). "Thus, non-

dischargeability is 'perceived to be a punitive exception to the "fresh start" policy and should be found reluctantly.'" *In re Krautheimer*, 210 B.R. at 46 (quoting *Matter of Martonak*, 67 B.R. 727, 728 (Bankr. S.D.N.Y. 1986)).

## II. <u>Collateral Estoppel</u>

Creditor's sole claim on appeal is that the Bankruptcy Court erred by not finding collateral estoppel based upon the finding of breach of fiduciary duty by the Westchester County Surrogate's Court.[3] Creditor claims that the state court's determination that Debtor "exploited" and "misappropriated" corporate assets constituted a finding of "defalcation while acting in a fiduciary capacity" within the terms of § 523(a)(4), thus estopping Debtor from relitigating those issues and estopping the Bankruptcy Court from reassessing the factual predicate of those determinations.

It is well settled that collateral estoppel applies in bankruptcy proceedings, including those arising under Section 523(a). *See Grogan*, 498 U.S. at 284 n.11; *In re DeTrano*, 326 F.3d 319, 322 (2d Cir. 2003). However, in order for collateral estoppel to apply, the issue sought to be precluded must be identical to an issue actually and necessarily decided in the prior action. *See, e.g.*, *Chartier*

---

[3] Debtor recasts the issue as one of res judicata. Specifically, Debtor argues that Creditor's voluntary dismissal with prejudice of his fourth claim for relief—for nondischargeability on the merits—constitutes a final dismissal on the merits such that res judicata bars Creditor's first claim for relief—for nondischargeability due to collateral estoppel—because the claims are identical. According to Debtor, "Judge Hardin left for this Court's determination the legal effect of the voluntary dismissal of the fourth claim for relief on plaintiff's right to prosecute an appeal from the earlier dismissal of the first claim for relief." (Def.-Appellee Br. at 12.)

The Court finds no basis for this statement in either the Bankruptcy Court opinion or in statements made by Judge Hardin at the hearings in this case. The case law Debtor cites fails to establish the applicability of res judicata to claims adjudicated in the same action, as opposed to those adjudicated in previous actions. Moreover, the Bankruptcy Court found that Creditor in no way intended for the voluntary dismissal to have such an effect. (12/27/04 Hr'g Tr. at 7-8.)

*v. Marlin Mgmt., LLC*, 202 F.3d 89, 94 (2d Cir. 2000). "The party asserting collateral estoppel bears the burden of demonstrating that it is entitled to this relief." *May Ship Repair Contracting Corp. v. Barge Columbia N.Y.*, 160 F. Supp. 2d 594, 599 (S.D.N.Y. 2001) (citing *In re Sokol*, 113 F.3d 303, 306 (2d Cir. 1997)). Specifically, "[t]he party invoking collateral estoppel has the burden of identifying the precise issues litigated in the prior action and establishing a record sufficient to reveal the controlling facts." *In re Landrin*, 173 B.R. at 312 n.5.

Creditor fails to meet this burden. Creditor's reliance on the state court's characterization of Debtor's conduct as "co-option," "misappropriation" and "exploitation" of corporate assets does not persuade this Court that the issue of "defalcation," as that term is interpreted under the Bankruptcy Code, was previously decided. As this Court explained at length in *Zohlman v. Zoldan (In re Zoldan)*, 226 B.R. 767, 772 (S.D.N.Y. 1998) (Conner, J.), "the definition[] of . . . 'defalcation' for purposes of § 523(a)(4) [is a] highly specialized determination[], and [its] meaning is narrowly confined to the bankruptcy context." Accordingly, the state court's limited opinion coupled with Creditor's inability to provide any indication of Debtor's wrongful conduct—despite the Bankruptcy Court's repeated requests to do so—renders it "impossible to say that the existence of . . . defalcation [was] 'specifically decided' by the state court." *Id.* (quoting *Nate B. & Francis Spingold Found., Inc. v. Halperin (In re Halperin)*, 215 B.R. 321, 336 (Bankr. E.D.N.Y. 1997)). This result is required "since any reasonable doubt as to what was previously decided by a prior judgment should be resolved by deciding against using it as estoppel." *Id.*

### III. The Definition of "Defalcation"

Section 523(a)(4) excepts from discharge a debt "for fraud or defalcation while acting in a

fiduciary capacity." In *In re Zoldan*, this Court examined the meaning of "defalcation" at length after noting the widespread disagreement over its definition among those deciding the issue. 226 B.R. at 775 (collecting cases). Therefore, there is no need to repeat that exposition here. It is enough to note that, as in *Zoldan*, the parties disagree over whether defalcation must include some element of wrongful intent. "This distinction becomes central to the instant case because" the Surrogate's Court's opinion fails to elaborate on the precise conduct constituting the breach of fiduciary duty. *Id.* "Thus, we are left with the question of whether defalcation can include merely negligent or even innocent default." *Id.*

Creditor argues that the Surrogate's Court's determination that Debtor breached his fiduciary duty demonstrates that Debtor committed a defalcation.[4] Creditor relies principally on *In re*

---

[4] The Surrogate's Court's opinion states in pertinent part:
> The proof . . . supports the petitioner's contention that Hyman exploited the assets of NPS and NPA to obtain profits for himself through the general agency. The Hyman Agency operated out of the same space as Denton-Hyman. It used the NPS[] phone number as its own. It used the same "continuum of agents" who carried NPS business cards to sell Guardian products for the general agency. It used NPS and NPA employees to design and administer pension plans, and to train and provide support services to Guardian agents. It used information culled from NPS files to sell additional insurance products to NPS clients. It used NPS to conduct annual seminars and create opportunities for the agents. . . . Finally, Hyman used Denton-Hyman funds to subsidize NPS' operations and to satisfy Hyman Agency debt to the Guardian.

(Stein Decl., Ex. A at 6.)

The Surrogate's opinion goes on to state:
> Hyman breached that duty by co-opting the Denton-Hyman, NPS and NPA enterprise for the benefit of the Hyman Agency and for his own personal enrichment. His actions constituted a misappropriation of the tangible assets and goodwill of Denton-Hyman, NPS and NPA. The use of NPS and NPA as feeders of new business for the Hyman Agency without compensation constitutes a breach of fiduciary duty . . . . The use of furniture and fixtures of NPS, NPA and Denton-Hyman by Hyman and the Hyman Agency without compensation also constitutes a breach of fiduciary

*Hammond*, 98 F.2d 703 (2d Cir. 1938), *cert. denied*, 305 U.S. 646 (1939), for the proposition that no wrongful intent is necessary for a defalcation, and therefore the Surrogate's decision on breach of fiduciary duty is sufficient to establish defalcation. In that case, directors of a corporation purchased shares of stock in their own names to enable the corporation to gain access to patents controlled by the company issuing the shares. Those directors then made large profits through the sale of the stock, which they kept for themselves. The Second Circuit found director Hammond liable for breaching his duty of undivided loyalty and his debt nondischargeable because he "misappropriated" funds within the meaning of § 523(a)(4).[5] The Court of Appeals reasoned that because Hammond was chargeable with knowledge of the law concerning fiduciary duty and because his appropriation of the stock profits was intentional, it constituted a misappropriation excepting the debt from release. *See id.* at 705.

However, this Court does not agree with Creditor's broad interpretation of *Hammond*. Creditor fails to acknowledge that the *Hammond* court justified its decision using the reasoning of *Central Hanover Bank & Trust Co. v. Herbst*, 93 F.2d 510 (2d Cir. 1937), where the court "assumed arguendo that 'defalcation' demands some measure of misconduct." *In re Hammond*, 98 F.2d at 706

---

> duty . . . . The use of Denton-Hyman overrides to subsidize NPS and NPA and to satisfy Hyman Agency debt to the Guardian is a further breach of fiduciary duty . . . .

(*Id.*, Ex. A at 8-9.)

[5] The relevant statute in 1939, Section 17(a)(4) of the Bankruptcy Act of 1898, excepted from discharge any debts "created by . . . fraud, embezzlement, misappropriation, or defalcation while acting as an officer, or in any fiduciary capacity." The statute in force today, Section 523(a)(4), uses the more limited language "fraud or defalcation"; however, the statute's meaning is not limited by the change. *See The Andy Warhol Found. for Visual Arts, Inc., v. Hayes (In re Hayes)*, 183 F.3d 162, 168 (2d Cir. 1999) ("Although the precise language of the defalcation exception has changed slightly in each major revision of the bankruptcy code, there is wide agreement that its meaning has not." (footnote omitted)).

9

(summarizing the conclusion of *Central Hanover*). In *In re Zoldan*, this Court analyzed *Central Hanover* in detail:

> Those who advocate a broad interpretation of "defalcation," so as to include innocent or negligent conduct, often cite only one section of Judge Learned Hand's now famous decision:
>> Colloquially perhaps the word, "defalcation," ordinarily implies some moral dereliction, but in this context it may have included innocent defaults, so as to include all fiduciaries who for any reason were short in their accounts.
>
> *Central Hanover*, 93 F.2d at 511. However, a closer reading of the case reveals Judge Hand's further explanation, implying that some "moral dereliction" might actually be required: "In the case at bar the bankrupt has not been entirely innocent . . . 'defalcation' may demand some portion of misconduct; we will assume arguendo that it does." *Central Hanover*, 93 F.2d at 512.

*In re Zoldan*, 226 B.R. at 776-77 (footnote omitted). Accordingly, the Court returns to the definition given in *Zoldan*: "Defalcation requires more than mere negligence, and cannot be a completely innocent act. While defalcation may not require actual intent, nor may it rise to the level of misappropriation, it does require some level of mental culpability." *Id.* at 777. In arriving at this conclusion, the Court is mindful "that it is a basic principle of statutory construction that an exception to a debt's discharge should be strictly construed because of the policy of favoring a debtor's fresh start." *Id.* ("Given the ever-expanding definition of what constitutes a 'fiduciary,' to couple this expansion with an equally expansive view of defalcation would defeat the fresh start objective of the bankruptcy law.") (collecting cases). In applying the legal meaning of "defalcation" to the facts of this case, we are mindful that the Bankruptcy Court's legal conclusions are reviewed *de novo* and its factual findings stand unless clearly erroneous.

Although Creditor argues that Debtor's conduct in the instant case was "far more egregious" than the conduct in *Hammond*, this Court is not so persuaded. Debtor's immediate offer to buy out the Estate's interest, three-year-long negotiation over the purchase price and payment of DHA's $1.6

million in debt does not strike this Court as "egregious," certainly not more so than the conduct in *Hammond*. Debtor's conduct throughout was fully consistent with a good faith effort to preserve the business for the mutual benefit of AHA and the Estate.

Nor are we bound by the Surrogate's conclusion that Creditor never consented to or acquiesced to Debtor's continuation of the business. Creditor asserts that the Bankruptcy Court decision is erroneous because it was not entitled to redecide issues surrounding Debtor's state court affirmative defense of consent and acquiescence. In arguing that this issue was conclusively determined at the state court level, Creditor relies on a single sentence in the conclusion section of the Surrogate's Court's opinion where the court stated: "The Court has considered the balance of respondent's arguments and finds them unpersuasive and wholly unsupported by even a sympathetic reading of the testimony and evidence adduced at trial." (Stein Decl., Ex. A at 14; Pl.-Appellant Br. at 42.) The Bankruptcy Court questioned the extent to which this language permitted collateral estoppel on an issue decided at best implicitly. (11/15/04 Hr'g Tr. at 18.) As do we. It is not clear to us that the Surrogate's statement extends so far as to eliminate reliance on the negotiation process to disprove defalcation. Having already determined that collateral estoppel does not apply, we cannot say that the Bankruptcy Court's determination regarding Creditor's "knowledge and acquiescence" of Debtor's actions was clearly erroneous given the overwhelming evidence in the record indicating Creditor's acknowledgment of and willingness to allow the continuation of the businesses.

Creditor also relies on *Rothman v. Beeber (In re Beeber)*, 239 B.R. 13 (Bankr. E.D.N.Y. 1999), to establish that a conversion amounting to defalcation occurred. In *Beeber*, conversion of a medical practice constituted a breach of fiduciary duty sufficient to meet the definition of

defalcation where one 50% shareholder and doctor in a professional medical corporation converted the practice to his own private practice by, among others, changing the certificate of incorporation to reflect only his name, planning to move the office location, removing all medical records and telling all patients that the office had relocated, all without his partner's consent. *See id.* at 33-34. Creditor finds these facts analogous to the instant situation, and contends that the Surrogate's finding of conversion must constitute defalcation. Indeed, such a conclusion seems correct given the Surrogate's findings indicated above, *see supra* note 4. But *Beeber* arrives at its conclusion for a reason not present in this action. Creditor ignores the fact that *Beeber* made much of Debtor's failure to follow proper corporate procedure, especially the lack of a shareholder vote authorizing the amendment to the certificate of incorporation. *See id.* at 34. Although the court stated that the "'conversion' . . . was a violation by [debtor] of his fiduciary duty to the corporation," it indicated that the surreptitious conversion was a result of Debtor's failure to buy out the Creditor's share of the medical practice. *See id.*

As already stated, here there were ongoing, arms length negotiations assisted by competent professionals regarding Debtor's purchase of the Estate's shares in DHA, a "defunct" company that terminated upon Denton's death. These good faith negotiations over the proper value for the Estate's shares continued up until Creditor filed the derivative action against DHA.

We find Creditor's remaining cited case law equally unpersuasive. Given our finding that collateral estoppel was inapplicable to the defalcation issue, we cannot say Creditor has established that breach of fiduciary duty as found by the Surrogate is synonymous with defalcation. It is important to note that the Bankruptcy Court—both at the hearing and in its opinion—repeatedly expressed its inability to determine exactly what conduct was wrongful. Judge Hardin stated

"[W]hen I first read the motion papers and read . . . the conclusions by the Surrogate I thought this is a slam dunk for the Denton estate . . . . But then when you get beneath that and try to figure out what did he do that was wrong, what else should he have done, I still don't have an answer." (11/15/04 Hr'g Tr. at 13.) Judge Hardin repeatedly asked Creditor's counsel to provide an answer; none was given beyond citation to the Surrogate's Court's opinion that Debtor had co-opted, misappropriated and exploited assets of DHA, NPS and NPA. (10/28/04 Hr'g Tr. at 45, 48, 51, 56, 57.) The Court agrees with Judge Hardin's reaction: "I can read the words . . . but I have difficulty ascribing meaning within the contemplation of the Bankruptcy Code to all the adjectives." (*Id.* at 60.)

Accordingly, this Court, in finding the Surrogate's opinion not dispositive of the issue of defalcation, finds that no defalcation was committed. As Creditor is unable to establish defalcation, we need not decide the issue of fiduciary capacity on this appeal.

## CONCLUSION

For the above-listed reasons, the decision of the Bankruptcy Court is affirmed.

SO ORDERED.

Dated: White Plains, New York
       November 30, 2005

*William C. Conner*
Sr. United States District Judge

13